**BEFORE THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| PETER HONIGMANN and MOLLY FOLEY ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| ) | Case No. 17-cv-6225 |
| VOLKSWAGEN AKTIENGESELLSCHAFT, ) | |
| VOLKSWAGEN GROUP OF AMERICA, INC.; ) | Trial by Jury Demanded |
| FOX VALLEY VOLKSWAGEN, LLC; ) | |
| ROBERT BOSCH GmbH, ) | |
| ROBERT BOSCH, LLC, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

NOW INTO COURT COMES the Plaintiffs, Peter Honigmann and Molly Foley, by and through counsel undersigned, Gassman Legal, P.C., and for their Complaint against Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Fox Valley Volkswagen, LLC, Robert Bosch GmbH, and Robert Bosch, LLC, state as follows:

## PARTIES

1.     Plaintiffs, Peter Honigmann and Molly Foley, are individuals and are a married couple living in Prairie View, Illinois.

2.     Defendant Volkswagen Aktiengesellschaft a/k/a Volkswagen AG (herein "VW AG") is a German corporation with it principal place of business in Wolfsburg, Germany.  VW AG is in the business of designing, developing, manufacturing, and selling automobiles, namely Volkswagens.  Automobiles designed, developed, and manufactured by VW AG are sold in the Northern District of Illinois.

3.     Defendant Volkswagen Group of America, Inc., (hereinafter "VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche

1

Drive, Herndon, Virginia. VW America is in the business of advertising, marketing, and selling Volkswagen automobiles in the United States, including in the Northern District of Illinois.

4.     At all times relevant to this cause of action, VW America was and is a wholly-owned subsidiary of VW AG.

5.     Robert Bosch GmbH (hereinafter "Bosch-Germany") is a German corporation with its principal place of business in Gerlingen, Germany. Bosch-Germany is an engineering and electronics company in the business of designing, manufacturing, and supplying electronic parts for automobiles, including those sold in the United States and the Northern District of Illinois. Bosch-Germany is the parent company of Robert Bosch LLC.

6.     Robert Bosch LLC, (hereinafter "Bosch-America") is a Delaware limited liability company with its principal place of business at 38000 Hills Tech Drive, Farmington Hills, MI 48331. Robert Bosch LLC is a wholly-owned subsidiary of Bosch-Germany. Robert Bosch LLC is in the business of designing, manufacturing, and supplying electronic parts for automobiles sold in the United States, including the Northern District of Illinois. Bosch-Germany and Bosch-America are collectively referred to herein as the "Bosch Defendants."

7.     Defendant Fox Valley Volkswagen, LLC, (hereinafter "Fox Valley VW") is an Illinois limited liability company, and is a car dealership located within the Northern District of Illinois at 560 West North Avenue, West Chicago, Illinois.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, based upon the federal RICO claim asserted under 18 U.S.C. § 1961 *et seq*. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is appropriate in this district, as a substantial part of the events or omissions giving rise to the claim occurred in this district, including the sale of the subject automobile to Plaintiffs.

## FACTUAL ALLEGATIONS

### The "Defeat Device"

10.     For several years, VW AG, a company which is publicly traded in Germany, has sought to increase its sales of automobiles, including the type of vehicle which is the subject of this lawsuit.  In furtherance of that effort, VW AG formed VW America to expand its market share throughout the United States.

11.     In order to expand its share in the diesel automobile market, VW AG sought to overcome the public perception that diesel vehicles emit thick and toxic pollutants, in contrast to gasoline engines.  To do so, VW AG sought to develop an engine that maintained the power and efficiency of a diesel engine, while producing reduced emissions as required in the United States.

12.     Pursuant to Federal law, specifically the Clean Air Act, 42 U.S.C. §§ 7401-7671qm and the implementing regulations, administered by the Environmental Protection Agency ("EPA"), automobile manufacturers are required to install emission control devices to ensure that each diesel vehicle sold in the U.S. complies with the emission standards of the Clean Air Act, and to certify that such devices have been installed and are operative and meet the required standards.

13.     In order to introduce a vehicle into the U.S. stream of commerce, automakers like VW AG and VW America must apply for and receive an EPA-administered Certificate of Compliance ("COC") certifying that the vehicle complied with emission standards set forth in 40 C.F.R §§ 86.1811-04, 86.1811-09, and 86.1811-10.  Without a valid COC, a new car could not be sold in the U.S.

14.     VW AG found its objective of developing an efficient and powerful diesel engine that also complied with the U.S. emission standards, an impossible and/or economically infeasible endeavor.

15.     To overcome this challenge, VW AG sought to design and develop a "defeat device," which was a secretly embedded software algorithm that could detect when the vehicle was undergoing an emission test.  When the "defeat device" detected that the vehicle was undergoing an emission test, the software would activate a pollution control device, simulating compliance with emission laws, thus enabling the vehicle to pass the emission test.

16.     This "defeat device" would permit VW AG and VW America to apply for and receive the necessary COC.

17.     However, when the emission tested ended, and during regular operation of the vehicle, the vehicle emitted harmful nitrogen oxide into the air at a rate of up to 40 times the legal limit, in violation of the Clean Air Act.  The suppression of the emission controls also resulted in more torque and better gas mileage, at levels which would not be achieved if the "defeat device" were activated.

18.     Since at least 2009 to the present, VW AG designed, developed, manufactured, and exported to the United States certain vehicles with 2.0-liter TDI® (short for turbocharged direct injection) diesel engines, which were advertised, marketed, sold, and warranted by VW America.  These 2.0-liter TDI® diesel engine vehicles include, but are not necessarily limited to, the following: 2013-2015 Beetle and Beetle Convertible; 2010-2013 Golf 2-Door; 2010-2015 Golf 4-Door; 2015 Golf SportWagen; 2009-2015 Jetta; 2009-2014 Jetta SportWagen; and 2012-2015 Passat (hereinafter the "Affected Vehicles").

19.     Since at least 2009 to the present, VW AG and VW America installed the "defeat device" in their Affected Vehicles in order to trick the EPA into granting them the necessary COC, and trick state emissions regulators during post-sale emission testing.

20.     The engines in these Affected Vehicles were marketed as having a "TDI® Clean Diesel Engine".  VW AG, VW America, and Fox Valley VW advertised the Affected Vehicles as being "clean" and "green" diesel vehicles, offering a quiet diesel engine that obtained high gas mileage and excellent performance, while conforming to stringent emission standards.

21.     Since at least 2009 to the present, Fox Valley VW was one of the dealerships that sold these Affected Vehicles with the "defeat device."

22.     VW AG and VW America knowingly sold Affected Vehicles with the "defeat device" throughout the United States between 2009 and 2015.

23.     VW AG and VW America have admitted that approximately 11 million of its vehicles sold were equipped with the "defeat device."

24.     Without the "defeat device," VW AG and VW America would not have been able to sell their Affected Vehicles in the United States, because they would not have obtained the necessary EPA Certificates of Conformity.

25.     On September 3, 2015, VW AG disclosed to the U.S. Environmental Protection Agency that the "defeat device" did in fact exist in model year 2009-2015 diesel vehicles, that the "defeat device" could recognize whether a vehicle was undergoing emission testing, and that the software made the vehicle emit higher levels of nitrogen oxide when driven on the road.

26.     During an October 2015 Congressional hearing, when asked if the software was installed "for the purpose of beating [emission] tests," the CEO of VW America, Michael Horn, admitted that "it was installed for this purpose."

27. A study by Stephen R. H. Barrett, *et al.*, entitled *Impact of the Volkswagen Emissions Control Defeat Device on US Public Health*, IOPScience (Oct. 29, 2015), has estimated that the excess emissions from the Affected Vehicles will cause 59 early deaths in the U.S., and a monetized social cost of approximately $450,000,000.

28. Since the revelation that VW AG and VW America were designing, manufacturing, marketing, and selling the Affected Vehicles with the "defeat device," the United States Department of Justice filed a complaint alleging several violations of U.S. Clean Air Act.

29. In January 2017, VW AG agreed to plead guilty to "participating in a conspiracy to defraud the United States and VW's U.S. customers and to violate the Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain VW…branded diesel vehicles complied with U.S. emission standards, using cheating software to circumvent the U.S. testing process and concealing material facts about its cheating from U.S. regulators." DOJ Press Release (Jan. 11, 2017).

30. On January 11, 2017, VW AG signed the applicable plea agreement, through which it pleaded guilty to three counts, namely: (1) Count One – conspiracy in violation of 18.U.S.C. § 371; (2) Count Two – obstruction of justice in violation of 18 U.S.C. § 1512 (c); and (3) Count Three – introducing imported merchandise into the United States by mean of false statements in violation of 18 U.S.C. § 542. **(See Exhibit A pp. 2-6).** As part of that plea agreement, VW AG admitted and stipulated to the factual allegations set forth in exhibit 2 of the plea agreement, and agreed that it would not contest the admissibility of, nor contradict, the Statement of Facts contained in exhibit 2 in any proceeding. **(See Exhibit A p. 7)**.

31. On or about March 10, 2017, the United States District Court for the Eastern District of Michigan accepted VW AG's guilty plea.

6

**Bosch Defendants' Contribution to the Defeat Device**

32.     VW AG retained the Bosch Defendants to assist in development of the "defeat device."

33.     Specifically, the Bosch Defendants tested, manufactured, and sold an electronic diesel control ("EDC") to the VW Defendants for use in the Affected Vehicles.

34.     The Bosch Defendants worked closely with the VW Defendants to create specifications and software algorithms which could manage the vehicles' engine operation.

35.     The Bosch Defendants' EDC unit made it possible for the Affected Vehicles to detect that the vehicle was undergoing an emission test, during which the defeat device reduced the engine's performance and reduced emissions to within legal limits.

36.     The Bosch Defendants knew that the EDC unit could be and was used by Volkswagen to manipulate the emission testing.  Indeed, in 2007, one or both of the Bosch Defendants sent a letter to Volkswagen advising that of the potential illegal use of the EDC unit technology.  However, the Bosch Defendants went on to sell Volkswagen around eleven million of these EDC units.

**Plaintiffs' Purchase of an Affected Vehicle**

37.     In 2010, Plaintiffs were in the market for a new car.  Their objective was to purchase a vehicle that offered quality performance, excellent mileage, while conforming to the EPA emission standards.

38.     Based on the Plaintiffs' research of available vehicles, and the advertising of the Defendants VW AG, VW America, and Fox Valley VW, Plaintiffs determined that the 2011 Volkswagen Jetta TDI Wagon best fit their requirements.

39.     On or about December 22, 2010, Plaintiffs purchased a 2011 Volkswagen Jetta TDI Wagon with vehicle identification number 3VWPL7AJ0BM618146 from Defendant Fox

7

Valley VW, for a total price of $30,046.94. Plaintiffs financed their purchase through Volkswagen Credit, which is a subsidiary and/or affiliate of VW America. The terms of Plaintiffs' financing called for 66 monthly payments of $480.19. (**See Exhibit B**).

40. Defendants VW AG, VW America, and Fox Valley VW, advertised Plaintiffs' vehicle as having a TDI Clean Diesel Engine which attained an estimated combined fuel economy of 34 miles per gallon, which was at the top end of all small station wagons.

41. Plaintiffs purchased this specific vehicle based on their belief that the Jetta TDI was a "clean diesel" that attained a combined fuel economy of 34 miles per gallon, as represented by Defendants VW AG, VW America, and Fox Valley VW.

42. Plaintiffs drove their vehicle from December 2010 through September 2015, unaware that it contained the "defeat device" and emitted illegal levels of nitrogen oxide.

43. The presence of the "defeat device" in the vehicle was not discoverable by Plaintiffs.

44. Plaintiffs could not have discovered the Defendants' fraud and deception through the exercise of reasonable due diligence within any applicable period of limitations.

45. Plaintiffs' causes of action alleged herein did not accrue until Plaintiff discovered that their vehicle had an illegal "defeat device", which at the earliest would have been September 18, 2015, when the EPA Notice of Violation became part of the public record.

46. Any applicable statutes of limitations have therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged above.

## COUNT I
**(Against VW AG, VW AMERICA, BOSCH-GERMANY, and BOSCH-AMERICA)**

## VIOLATION OF 18 U.S.C. § 1962(c)-(d)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

47.     Plaintiffs incorporated by reference paragraphs 1 through 46 as though fully set forth herein.

48.     Plaintiffs bring this RICO count against VW AG, VW America, Bosch-Germany, and Bosch-America.

49.     VW AG, VW America, Bosch-Germany, and Bosch-America conduct their business through various affiliates and subsidiaries, each of which is a separate legal entity. At all times relevant to this action, VW AG, VW America, Bosch-Germany, and Bosch-America have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

50.     18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

51.     VW AG and VW America are each engaged in activities which affect interstate and foreign commerce, as the as they market and sell German manufactured automobiles throughout all 50 of the United States.

52.     Bosch-Germany and Bosch-America are each engaged in activities which affect interstate and foreign commerce, as they designs and sells part for vehicles that are sold throughout all 50 United States.

53.     18 U.S.C. § 1962(d) provides that it is unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

54.     VW AG is also the parent corporation of Audi AG and Dr. Ing. h.c. F. Porsche AG ("Porsche AG"), both German corporations.  Along with VW AG, during the times relevant to this lawsuit, Audi AG and Porsche AG developed and installed the defeat device software in certain of their vehicles equipped with 3.0-liter TDI® diesel engines.

55.     Audi AG formed Audi of America, LLC, its wholly-owned U.S. subsidiary, to market and sell its vehicles within the U.S.

56.     Porsche AG formed Porsche Cars North America, Inc., its wholly-owned U.S. subsidiary, to market and sell its vehicles within the U.S.

57.     At all times relevant to this lawsuit, VW AG maintained control over the design and manufacture of the Affected Vehicles, and the introduction of the "defeat device" into vehicles produced by Audi AG and Porsche AG.

58.     At all times relevant to this lawsuit, VW AG, VW America, Bosch-Germany, and Bosch-America, along with other individuals and entities, including Audi AG, Audi of America, LLC, Porsche AG, and Porsche Cars North America, Inc., operated an association-in-fact enterprise as defined by 18 U.S.C. § 1961(4), which was formed and carried out in order to fraudulently obtain COCs from the EPA so that they could import, market and sell their vehicles, including the Affected Vehicles, which contained the "defeat device," throughout the U.S.

59.     Alternatively, VW America, Porsche Cars North America, Inc., and Robert Bosch LLC, together constitute a single legal entity "enterprise" as defined by 18 U.S.C. § 1961(4), through which VW AG, VW America, Robert Bosch LLC, Audi AG, Audi of America, LLC, Porsche AG, and Porsche Cars North America, Inc., pursued their racketeering activities within the U.S.  VW America is the entity through which EPA COCs were applied for and obtained for the Volkswagen and Audi vehicles, while Porsche Cars North America, Inc., was the entity

through which COCs were applied for and obtained for Porsche vehicles. Bosch-America supplied components which permitted the Affected Vehicles to cheat the emission testing.

60.     The enterprises alleged in paragraphs 58 and 59 are collectively referred to as the "RICO Enterprise."

61.     At all times relevant to this lawsuit, the RICO Enterprise constituted a single "enterprise" or multiple enterprises pursuant to 18 U.S.C. § 1961(4), as legal entities, as well as legal entities associated-in-fact for the common purpose of engaging in their illegal scheme.

62.     In pursuing the COCs so they could market and sell their Affected Vehicles, the RICO Enterprise, which included VW AG, VW America, Bosch-Germany, and Bosch-America, conducted a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

63.     In furtherance of their scheme to defraud the U.S. and U.S. consumers, and in carrying out their racketeering activity, VW AG, VW America, Bosch-Germany, and Bosch-America, each of which is a person associated-in-fact with the RICO Enterprise, knowingly participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), by using U.S. mail and wire services, in violation of 18 U.S.C. § 1341 and 18 U.S.C. §1343.

64.     On information and belief, VW AG, VW America, Bosch-Germany, and Bosch-America committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity described below within the past ten years. These acts of racketeering activity were related to each other, posed a threat of continuing racketeering activity, and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

65.     On information and belief, VW AG, VW America, Bosch-Germany, and Bosch-America violated 18 U.S.C. § 1341 (commonly known as mail fraud) in furtherance of their

scheme by knowingly using the U.S. Postal Service and/or commercial interstate carriers, to send and receive materials for the purpose of executing their scheme to design, manufacture, market, and sell the Affected Vehicles under false pretenses and misrepresentations, all in an effort to obtain money from U.S. consumers.

66.     On information and belief, VW AG, VW America, Bosch-Germany, and Bosch-America violated 18 U.S.C. § 1343 (commonly known as wire fraud) in furtherance of their scheme by knowingly transmitting and/or receiving by wire, materials for the purpose of executing their scheme to design, manufacture, market, and sell the Affected Vehicles under false pretenses and misrepresentations, all in an effort to obtain money from U.S. consumers.

67.     On information and belief, VW AG's, VW America's, Bosch-Germany's, and Bosch-America's use of the mails and wires (including the internet) include, but are not necessarily limited to, the interstate transmission, delivery and/or shipment of: fraudulent applications for EPA COCs; fraudulently obtained EPA COCs; falsified emission tests; the Affected Vehicles and their component parts; the defeat devices and their component parts; sales and marketing material (including websites) which misrepresented the truth about the Affected Vehicles; documents relating to the sale of Affected Vehicles; and other false documents and electronic communications.

68.     It was reasonably foreseeable to VW AG, VW America, Bosch-Germany, and Bosch-America that they and other members of the RICO Enterprise would use interstate mail and wire services to send, receive, transmit, deliver, and/or ship the aforementioned documents, items and/or communications in order to carry out the scheme.

69.     That the aforementioned use of mail and wire services was intended to deceive and mislead regulators and the public regarding the fuel efficiency, performance, and emission metrics with respect to the Affected Vehicles.

70.     VW AG, VW America, Bosch-Germany, and Bosch-America engaged in these practices over several years as part of an ongoing scheme and conspiracy.  VW AG, VW America, Bosch-Germany, and Bosch-America violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  Various other individuals and entities not named as defendants in this case participated as co-conspirators with VW AG, VW America, Bosch-Germany, and Bosch-America in furtherance of the conspiracy, with the common objective being to maximize their revenues by obtaining money from consumers.

71.     VW AG, VW America, Bosch-Germany, and Bosch-America knew and intended that government regulators, U.S. consumers, and the Plaintiffs herein, would rely on the falsehoods and misrepresentations they put forth regarding the Affected Vehicles, including the Plaintiffs' vehicle.

72.     The Plaintiffs did in fact rely on these falsehoods and misrepresentations by virtue of the fact that they purchased an Affected Vehicle which never would have entered the stream of commerce but for VW AG's, VW America's, Bosch-Germany's, and Bosch America's illegal scheme.  That is, had VW AG, VW America, Bosch-Germany, and Bosch-America been truthful regarding the performance of the Affected Vehicles, including Plaintiffs' vehicle, they never would have obtained a valid COC from the EPA.

73.     As a direct and proximate result of the illegal activities of VW AG, VW America, Bosch-Germany, and Bosch-America, in violation of 18 U.S.C. 1962(c)-(d), the Plaintiffs have been injured in the following respects:

(a)     they purchased an illegal and defective vehicle;

(b)     they substantially overpaid for a vehicle that was unable to meet emission standards;

(c)     they substantially overpaid for a vehicle that did not perform as advertised;

(d) they did not receive the resale value they otherwise would have if the vehicle were "legal";

(e) they were forced to incur the cost of a new vehicle sooner than they anticipated;

(f) financing charges; and

(g) other out-of-pocket expenses.

74. The Plaintiffs are entitled to bring this action for three times their actual damages, plus costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

WHEREFORE, Plaintiffs, Peter Honigmann and Molly Foley, respectfully request that they be awarded treble damages, reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

### COUNT II
### (Against VW AG, VW AMERICA and FOX VALLEY VW)

### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE PRACTICES ACT

75. Plaintiffs re-state and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint.

76. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "ICFA"), 815 ILCS 505/2, provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

77. 815 ILCS 505/1(a) defines the term "advertisement" to include the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any

14

person...to acquire any title or interest in any merchandise." Defendants' advertisements and inducements made with respect to the Affected Vehicles generally, and Plaintiffs' vehicle specifically, within Illinois and throughout the United States come within the definition of "advertisements" as contained in 815 ILCS 505/1(a).

78.    815 ILCS 505/1(b) defines the term "merchandise" to include any "objects," "wares," and "goods." The Affected Vehicles generally, and Plaintiffs' vehicle specifically, meet the definition of "merchandise" within the meaning of 815 ILCS 505/1(b).

79.    815 ILCS 505/1(c) defines "person" to include any "natural person," "corporation (domestic and foreign)," "company," and "business entity or association." Defendants and Plaintiffs are "persons" within the meaning of 815 ILCS 505/1 (c).

80.    815 ILCS 505/1(d) defines "sale" to include "any sale, offer for sale, or attempt to sell any merchandise for cash or on credit." Defendants' sales of the Affected Vehicles generally, and Plaintiffs' vehicle specifically, meet the definition of "sale" within the meaning of 815 ILCS 505/1 (d).

81.    815 ILCS 505/1(e) defines "consumer" to mean "any person who purchases or contracts for the purchase of merchandise...for his use or that of a member of his household." Plaintiffs are "consumers" within the meaning of 815 ILCS 505/1(e).

82.    815 ILCS 505/1(f) defines "trade" and "commerce" to mean "the advertising, offering for sale, sale, or distribution of any services or property...and shall include any trade or commerce directly or indirectly affecting the people of this State." Defendants engaged in "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

83.    Defendants violated the ICFA when they represented, through advertising, warranties, and other express representations, that Plaintiffs' vehicle had characteristics and benefits that they did not actually have, including but not limited to: a TDI Clean Diesel Engine;

15

an engine that complied with applicable emission standards, a vehicle that was capable of attaining advertised gas mileage while emitting legal levels of nitrogen oxide, and a vehicle that was capable of passing emission testing without the aid of secretly installed manipulators such as the "defeat device."

84. Defendants violated the ICFA when they falsely represented, through advertising, warranties, and other express representations, that Plaintiffs' vehicle was of certain quality or standard when they were not.

85. Defendants violated the ICFA by fraudulently concealing from and/or failing to disclose to Plaintiffs the defects associated with Plaintiffs' vehicle, including but not limited to the fact that: it did not contain a "clean diesel" engine; it included a "defeat device"; it could not attain advertised mileage while complying with applicable emission standards; and it could not legally pass emission testing.

86. Defendants violated the ICFA by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Affected Vehicles generally, and Plaintiffs' vehicle specifically. The material information included, but was not limited to: that the vehicles were "green, "clean" and had the "TDI® clean diesel engine"; and that the vehicles complied with the Clean Air Act and EPA regulations.

87. Defendants intentionally and knowingly misrepresented and/or concealed these material facts regarding the Affected Vehicles generally, and the Plaintiffs' vehicle specifically, with intent to misled Plaintiffs.

88. The deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of material facts alleged in the preceding paragraphs occurred in connection with Defendants' conduct of trade or commerce in Illinois.

89.     Defendants' deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission caused Plaintiffs to purchase said vehicle that they would otherwise not have purchased had they known the true nature of the vehicle.

90.     Defendants' conduct as stated herein constitutes a public injury, a pattern to their practice of advertising and selling vehicles, and resulted in serious negative consequences on consumers and the public at large, as contemplated in 815 ILCS 505/10(a).

91.     Defendants' conduct of planning, designing, and carrying out a scheme to manipulate the emissions results of its Affected Vehicles generally, and Plaintiffs' vehicle specifically, and overstate their vehicles' performance and gas mileage, which could only be accomplished through the secret installation of the "defeat device," was done with malice and ill-motive, and reflects the highest level of corporate deception and greed.  By any reasonable measure, Defendants' conduct was outrageous and requires a level of punitive damages designed to deter similar offenses in the future.

92.     As a direct result of Defendants' unlawful conduct, Plaintiffs sustained actual damages, including the money spent, and finance charges incurred, for their purchase of a vehicle that was worth substantially less than that which they received.

93.     As a result of Defendants' unlawful business practices, Plaintiffs, pursuant to 815 ILCS 505/10(a), are entitled to damages, including compensatory damages, punitive damages, and reasonable attorney's fees and costs.

WHEREFORE, Plaintiffs Peter Honigmann and Molly Foley respectfully request that the Court: a) award Plaintiffs compensatory damages equal to the value of the property and or property rights of which they were wrongfully deprived, and for the related emotional distress, caused by Defendants' misconduct, b) punitive damages, c) reasonable attorney's fees and costs, and 4) all other relief which this Court deems just and proper.

## COUNT III
### (Against VW AG, VW AMERICA and FOX VALLEY VW)

## COMMON LAW FRAUD IN THE INDUCEMENT

94.     Plaintiffs re-state and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint.

95.     Defendants intentionally designed the "defeat device" to circumvent the requirement of the Clear Air Act, and falsely certified to the EPA that the Affected Vehicles were in compliance with those requirements.

96.     At the same time, between 2009 and present, Defendants represented, through advertising, warranties, and other express representations, that the Affected Vehicles, including Plaintiffs' vehicle, had characteristics and benefits that they did not actually have, including but not limited to: a TDI Clean Diesel Engine; an engine that complied with applicable emission standards, a vehicle that was capable of attaining advertised gas mileage while emitting legal levels of nitrogen oxide, and a vehicle that was capable of passing emission testing without the aid of secretly installed manipulators such as the "defeat device."

97.     Defendants intentionally marketed and advertised the Affected Vehicle as "green" or "clean" and described the engine as a "clean diesel."

98.     Defendants knowingly made these false statements, advertisements, and representations in an effort to induce the public, including Plaintiffs, into believing that the Affected Vehicles were "green" and "clean," and capable of high performance while still complying with applicable emission standards, so they would purchase an Affected Vehicle.

99.     Plaintiffs reasonably and justifiably relied on the truth of the representations Defendants made in brochures, its website, advertisements, and in the owner's manual, in

believing that they were paying a premium for a fuel efficient "clean" automobile with a "TDI® clean diesel engine."

100.    Plaintiffs did not know, and had no way of knowing, that the representations made by Defendants were false.

101.    That the false representations by Defendants were material facts essential to the transaction between Defendants and Plaintiffs.

102.    Had Plaintiffs known the true facts regarding the Affected Vehicles generally, and their vehicle specifically, they would not have purchased their vehicle.  In fact, had Defendants disclosed the true facts about these vehicles to the EPA, the Affected Vehicle which Plaintiffs purchased, never would been sold.

103.    As a direct result of Defendants' fraudulent concealment and suppression of the true facts regarding Affected Vehicles generally, and Plaintiffs' vehicle specifically, Plaintiffs were fraudulently induced to purchase the Affected Vehicle which they would not have otherwise done.

104.    As a direct result of Defendants' fraudulent inducement Plaintiffs sustained actual damages, including the money spent, and finance charges incurred, for their purchase of a vehicle that was worth substantially less than that which they received.

105.    Defendants' conduct of planning, designing, and carrying out a scheme to manipulate the emissions results of its Affected Vehicles generally, and Plaintiffs' vehicle specifically, and overstate their vehicles' performance and gas mileage, which could only be accomplished through the secret installation of the "defeat device," was done with malice and ill-motive, and reflects the highest level of corporate deception and greed.  By any reasonable measure, Defendants' conduct was outrageous and requires a level of punitive damages designed to deter similar offenses in the future.

19

106.     As a direct result of Defendants' fraudulent inducement, Plaintiffs sustained actual damages, including the money spent, and finance charges incurred, for their purchase of a vehicle that was worth substantially less than that which they received.

107.     As a result of Defendants' unlawful business practices, Plaintiffs, pursuant to 815 ILCS 505/10(a), are entitled to damages, including compensatory damages, punitive damages, and reasonable attorney's fees and costs.

WHEREFORE, Plaintiffs Peter Honigmann and Molly Foley respectfully request that the Court: a) award Plaintiffs compensatory damages equal to the value of the property and or property rights of which they were wrongfully deprived, and for the related emotional distress, caused by Defendants' misconduct, b) punitive damages, c) reasonable attorney's fees and costs, and 4) all other relief which this Court deems just and proper.

## JURY DEMAND

Plaintiffs, Peter Honigmann and Molly Foley, demand a trial by jury of any and all issues for which they have such right.

Dated: August 28, 2017                    Respectfully Submitted,

                                          PETER HONIGMANN
                                          MOLLY FOLEY


                              By:    /s/ Bary L. Gassman

                                     Bary L. Gassman
                                     GASSMAN LEGAL, P.C.
                                     180 N. Stetson, Suite 3050
                                     Chicago, IL 60601
                                     T: (312) 279-2779
                                     F: (312) 279-2782
                                     bgassman@gassmanlegal.com